UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HILARY COYNE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 12-10318-DPW |
| v. | ) ) | |
| METABOLIX, INC., RICHARD P. ENO, and JOSEPH HILL, | ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM AND ORDER
September 20, 2013

Plaintiff Hilary Coyne brings this lawsuit alleging securities fraud by Defendant Metabolix, Inc. and two of its executives, Richard Eno and Joseph Hill.  Plaintiff contends the Defendants misrepresented the company's ability to meet certain projected milestones in its biopolymer plastic manufacturing business and that it hid issues regarding product quality.

Defendants move to dismiss arguing Plaintiff has not sufficiently alleged (1) any material misrepresentation, (2) that Defendants *knew* any misrepresentation was false, even if one did exist, or (3) that the alleged misrepresentations caused Plaintiff's loss.  Defendants contend that any statements regarding projected milestones were forward-looking estimates protected by Safe Harbor provisions of the Private Securities Litigation Reform Act ("PSLRA") and that while Metabolix had no duty to disclose the quality issues identified by Plaintiff, it

nevertheless did make those disclosures.  They also argue that
Plaintiff has not alleged any connection between some action or
inaction on the part of Metabolix and the event causing her loss:
the stock drop following the decision of Archer Daniel Midland
Company ("ADM") to pull its funding from the biopolymer plastic
project.

I find Plaintiff's Complaint relies too heavily on assumed
facts, unalleged connections, and selective readings of the
operative documents to state a proper claim for securities fraud.
Consequently, I will grant Defendants' motion to dismiss.

## I. BACKGROUND

Metabolix is a bioscience engineering company seeking to
design "sustainable" alternatives to the existing plastic,
chemical, and energy industries.  (Am. Compl. ¶¶ 22-23.)  In
2004, Metabolix entered into a joint venture with ADM to develop,
produce, and market a biopolymer plastic called
polyhydroxyalkanoate, under the brand name Mirel.  (*Id.* ¶¶ 23-
24.)  Together, they formed a company called Telles, LLC.  (*Id.* ¶
24.)  Metabolix provided the technology; ADM provided the
funding.  (*Id.* ¶¶ 24-27.)  Under their agreement, ADM could
terminate the joint venture if it decided, at any point, that the
"projected financial return" from the venture became "too
uncertain or inadequate."  (Birnbach Decl., Ex. 2 § 10.2.2.)
Metabolix informed its investors of ADM's termination right in

both its 2010 and 2011 Forms 10-K, filed with the SEC.  (*Id.,* Ex. 5 at 30, Ex. 17 at 14, 28.)

ADM financed the construction of a large factory in Clinton, Iowa that would be capable of producing 110 million pounds of Mirel each year.  (Am. Compl. ¶¶ 24, 28.)  During construction, Metabolix produced smaller quantities of Mirel at a pilot factory in South Carolina that Telles used to market the product to potential customers.  (*Id.* ¶ 28.)

One of the first major milestones for Telles was to reach the "commercial phase."  Under the joint venture agreement, Telles would reach the commercial phase after it shipped one million pounds of Mirel from the Clinton, Iowa factory, triggering various royalty payments to Metabolix and various cost and fee shifting agreements that would benefit Metabolix.  (*See id.* ¶¶ 29-30.)  Telles began manufacturing Mirel at the Clinton factory in early 2010.  (*Id.* ¶ 31.)  Initially, Metablolix anticipated that it would reach the commercial phase in the second half of 2010.  (*Id.* ¶ 49.)  However, over the next two years, Metabolix revised that prediction a number of times, citing various setbacks and delays.

First, in November 2010, Metabolix announced that it would not reach the commercial phase in late 2010, as initially anticipated, but that "our initial ramp to the milestone . . . will be slower than we planned by about three months.  We expect

this commercialization phase to occur early next year," in early 2011. (*Id.* ¶ 57.)  It cited a number of reasons for the delay, including "additional work we decided to undertake . . . to optimize our compounded product blends as they were scaled up to commercial status."  (*Id.*)

Next, in March 2011, it announced "[w]ith regards to near-term goals, as we communicated early this year, we expect a milestone at which the joint venture moves into the defined commercial phase to occur in midyear 2011."  (*Id.* ¶ 60.)

One month later, Metabolix revised its prediction from mid-2011 to the end of 2011.  In an April 2011 earnings call, it announced "we expect the milestone for the joint venture . . . to slip into the second half, 2011."  (*Id.* ¶ 68.)  It cited "supply disruption of . . . raw material . . . slow[ing] down the pace of commercialization" as well as "optimiz[ation] [of] the physical properties of our film product" as the driving factors for the delay.  (*Id.*)

Finally, as 2011 drew to a close, Metabolix issued a November press release predicting delay again.  Metabolix announced that Telles "has now sold more than half of the volume required for the achievement of the Company's First Commercial Sale milestone" and that

> shipments of qualifying product have been accelerating.
> [We] anticipate[] that the balance of the qualifying
> product to meet the milestone will be shipped within
> the next 45 to 120 days, with the First Commercial Sale

milestone expected to occur approximately 30 days
following.

(*Id.* ¶ 77.)

Before the anticipated 120-day period lapsed, ADM decided to
terminate the joint venture.  On January 12, 2012, Metabolix
issued a press release announcing that ADM had given notice that
it would terminate the Telles joint venture.  (*Id.* ¶ 81.)  By the
close of trading the next day, Metabolix stock dropped almost
57%.  (*Id.* ¶ 82.)  In the press release, Metabolix explained that
ADM had "undert[aken] a strategic review of its business
investments and activities" and decided to terminate the joint
venture because "the projected financial returns from the
alliance were too uncertain."  (*Id.* ¶ 81.)  In its own press
release, ADM stated "[w]e have analyzed our business portfolio,
identifying areas that are not delivering sufficient results" and
specifically with respect to the Telles joint venture,
"uncertainty around projected capital and productions costs,
combined with the rate of market adoption, led to projected
financial returns for ADM that are too uncertain."  (*Id.* ¶ 85.)

## II. PLAINTIFF'S THEORY OF THE CASE

Plaintiff's claims rest on two basic allegations: (1)
failing to disclose product quality issues and (2) making
optimistic statements regarding the anticipated dates for the
commercial phase without a rational basis.

5

First, Plaintiff contends that Metabolix's statements such as "based on analytical testing, the product appears indistinguishable from that produced in our pilot facility," (*id.* ¶ 51), and "[w]e've also improved the physical property [of] the mulch film product, to meet the retail segment and requirements which are now being validated," (*id.* ¶ 74) constitute material omissions because certain confidential witnesses quoted in the Amended Complaint describe issues with the physical product not present in the pilot factory's product, such as problematic odors and colors as well as problems with the extrusion process, (*see id.* ¶ 38-39). Both Plaintiff and the confidential witnesses attribute more of Telles' struggles to these quality issues than Telles or Metabolix did in their public statements, which do not refer to color, odor, or extrusion problems by name, but do make reference to "product optimization" and improvements to the "physical product."

Second, Plaintiff contends that Metabolix's predictions for when it would reach the commercial phase were false or misleading because it knew they were "impossible." Plaintiff alleges statements such as "we are starting to meet the pent-up demand for lots of customers that we have had in the queue for a while," (*id.*), and "we have continued to move a large number of potential customers through the product development process and have seen interest and demand for our bioplastic continue to build," (*id.* ¶

56), must be misleading because one confidential witness stated
that concerns about the quality of the Mirel product stunted
sales in the market, (*id.* ¶ 42), and another confidential witness
stated that he had only interacted with very few repeat customers
for Telles and that there was no steady pipeline or backlog, (*id.*
¶ 44).  In other words, Plaintiff charges Metabolix with material
misstatements because "internal information regarding Mirel sales
efforts and the Clinton Plant was contrary to the optimistic
statements made by Individual Defendants to the public." (*Id.* ¶
46).

### III.  STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must contain
sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556
U.S. 662, 678 (2009) (internal citation omitted).  "'Naked
assertion[s]' devoid of 'further factual enhancement'" do not
constitute adequate pleading. *Id.* (quoting *Bell Atl. Corp.* v.
*Twombly*, 550 U.S. 544, 557 (2007)).  All well-pleaded factual
allegations in the complaint must be taken as true and all
reasonable inferences must be drawn in the pleader's favor. *SEC*
v. *Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc).
However, "conclusory allegations" and "bare assertions . . .
amount[ing] to nothing more than a 'formulaic recitation of the
elements'" are not entitled to the presumption of truth. *Iqbal*,

556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555).  Unless the alleged facts push a claim "across the line from conceivable to plausible," the complaint is subject to dismissal.  *Iqbal*, 556 U.S. at 680.

Securities fraud cases charging violations of Section 10(b) of the Securities Exchange Act are also subject to the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA.  Rule 9(b) requires that cases sounding in fraud or mistake must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . ."  15 U.S.C. 78u-4(b)(1)(B).  It also requires plaintiffs to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  *In re Boston Scientific Corp. Secs. Litig.*, 686 F.3d 21, 30 (1st Cir. 2012) (emphasis in original)(quoting 15 U.S.C. 78u-4(b)(2)).

### III.  DISCUSSION

Plaintiff's foundational claim rests upon Section 10(b) of the Securities Exchange Act and Rule 10b-5.[1]  To survive a motion

---

[1] Plaintiff also brings a claim under Section 20(a) of the Securities Exchange Act for control person liability against the individual defendants.  Defendants challenge these claims only on the basis that some underlying fraud is a prerequisite to any Section 20(a) claim.  *See* 15 U.S.C. § 78t(a); *ACA Fin. Guaranty Corp.* v. *Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008).  Thus, Defendant's motion to dismiss the Section 20(a) claim rises or

to dismiss against such a claim, she must sufficiently allege (1) a material misstatement, misrepresentation, or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005); *In re Boston Scientific Corp. Secs. Litig.*, 686 F.3d 21, 27 (1st Cir. 2012). Defendants challenge the sufficiency of three elements: misstatement, scienter, and loss causation.

## A. *Material Misstatement*

A valid 10b-5 claim requires a false statement or a material misstatement/omission. *Gross* v. *Summa Four, Inc.*, 93. F.3d 987, 992 (1st Cir. 1996). The Amended Complaint recounts numerous statements it alleges were either false or misleading, all falling into at least one of the following categories:

1. Statements predicting when Telles would reach the commercial phase,

2. Statements that Metabolix saw significant demand for the Mirel bioplastic product,

3. Reassurances that the factory was operating well and any delay was due to supply and technical issues, and

4. Statements and omissions regarding the quality problems with the Mirel product coming out of the Clinton, Iowa factory.[2]

_____

falls with its 10b-5 arguments.

[2] There are also rumblings in the Complaint about the belief that Metabolix intended the factory in Clinton, Iowa to be eco-friendly and carbon neutral, (*see* Am. Compl. ¶¶ 41, 43), but Plaintiff stops short of alleging that this rises to the level of

Each of the categories of statements she contends were misleading presents its own legal questions.  I address them in turn.

1.  Commercial Phrase Predictions

Metabolix's statements predicting when Telles would reach the commercial phase are prototypical forward-looking statements falling into the heartland of the PSLRA safe harbor.  The safe harbor protects forward-looking statements, defined to include "a statement of future economic performance," (such as the anticipated dates for the First Commercial Sale of Mirel), as well as "any statement of the assumptions underlying or relating to any [such] statement."  15 U.S.C. 78u-5(i)(1)(C)-(D).  Forward-looking statements cannot subject Defendants to securities fraud liability so long as they (1) identify the statements as forward looking and include "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," and (2) did not have actual knowledge that the statement was false or misleading.  15 U.S.C. 78u-5(c)(1); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Waters Corp.*, 632 F.3d 751, 759 n.4 (1st Cir. 2011); *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 201 (1st Cir. 1999).

---

any false or misleading statement and does not pursue this line in her submissions.

Metabolix's predictions were incontestably forward looking. They were, by terms, predictions.  They project "future economic performance" in the form of sales needed to reach the commercial phase milestone.  15 U.S.C. 78u-5(i)(1)(C).  Every statement Plaintiff challenges uses some version of the phrase "we anticipate" or "we expect" - clear forward-looking, predictive language.  (*See, e.g.*, Am. Compl. ¶ 60 ("we expect a milestone at which the joint venture moves into the defined commercial phase to occur in midyear 2011."); *id.* ¶ 77 ("[We] anticipate[] that the balance of the qualifying product to meet the milestone will be shipped within the next 45 to 120 days, with the First Commercial Sale milestone expected to occur approximately 30 days following.").)

Plaintiff does not argue that Metabolix failed to identify these statements as forward looking or failed to include meaningful cautionary language.  In fact, both the 2010 and 2011 10-K clearly stated "[w]e cannot assure you that we will be able to successfully manufacture Mirel at a commercial scale in a timely or economical manner or that the quality of the commercial product will be acceptable on a consistent basis."  More specifically, a May 18, 2011 8-K stated "[a]chievement of the First Commercial Sale milestone is subject to a number of risks and uncertainties . . . . [T]here is no assurance that we will meet the First Commercial milestone in the second half of 2011."

Nor has Plaintiff alleged any facts from which a reasonable fact finder could infer that Metabolix made its predictions with "actual knowledge" that they were false or misleading.  The Complaint levels various vague (and largely conclusory) allegations of struggling sales, problems with production, and difficulty retaining repeat clients, (*see, e.g.,* Am. Compl. ¶¶ 35, 44-46, 77), but none demonstrate that Telles was *incapable* of meeting its predicted target dates.  It also does not allege with any particularity how the predictions were false.  Statements from a confidential witness that Telles "did not have a steady pipeline of return customers, nor a robust backlog of interest" and that it "was not at the point where it was getting 'sustainable sales' at the time of the cancellation," (*id.* ¶ 44), are both conclusory and too vague to satisfy the PSLRA and Rule 9(b) pleading standards.  They do not specify what "sustainable sales" means.  They do not state Telles' actual sales figures or why the existing sales figures would have made it impossible to meet the projected target dates.  They are also not probative of any *consciousness* that the projected figures were impossible, or even that they might have been overly optimistic.

In fact, Plaintiff concedes - or at least does not challenge - that the specific statements Metabolix made about Telles' sales were correct.  For instance, Plaintiff does not challenge the accuracy of the November press release stating that Telles "has

now sold more than half of the volume required for the achievement of the Company's First Commercial Sale milestone," (*see id.* ¶ 77), but - rather surprisingly - cites it as purported evidence of "actual knowledge" that it would be impossible for Telles to meet its milestone.  Standing alone, the fact that Telles sold half of the product necessary to reach the commercial phase by November 2011 is not evidence that it could not reach the milestone, especially in light of the fact that, in the same breath, Metabolix stated that it "anticipated that the balance of the qualifying product to meet the milestone will be shipped within the next 45 to 120 days."  (*Id.*)  Furthermore, the surrounding statements, that "shipments of qualifying product have been accelerating," (*id.*), and that Telles had nearly doubled its number of repeat customers since the previous quarter (up to 26 from 15), (*id.* ¶ 77) - whose accuracy Plaintiff does not challenge - lend credence to the innocent inference that Metabolix honestly believed it could achieve its stated target dates, fatally undercutting the plausibility of any inference that it actually believed such statements were false or misleading.  Indeed, even after ADM terminated the joint venture, the time at which Plaintiff alleges the truth was revealed, Metabolix continued to assert that Telles had been "on track with the guidance we provided in the last call" regarding progress toward the milestone.  (*Id.* ¶ 84.)  Nevertheless, Plaintiff

13

insists that Defendants knew it would be impossible for Telles to hit its predicted target dates.

Plaintiff attempts to satisfy her burden - of pleading particular facts demonstrating actual knowledge that Metabolix's predictions were impossible - by shooting from the hip.  The PSLRA puts the onus on her to take careful aim and pinpoint the particular facts capable of demonstrating that Metabolix knew it could not possibly meet its predictions.  She has not done so. In light of the detailed and uncontested statements of the dramatic rise in both repeat and first-time customers and the percentage of sales made towards the goal, Plaintiff cannot surmount the safe harbor by relying on broad, sweeping generalizations such as no "robust backlog of interest" and no "sustainable sales."

Alternatively, Plaintiff argues that each forward-looking prediction assumes and implies present facts that the company was in a position to meet those future predictions and that the PSLRA safe harbor cannot cover the implied statement regarding the present facts.  *See Makor Issues & Rights, Ltd*. v. *Tellabs Inc*., 513 F.3d 702, 705 (7th Cir. 2008)("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").  Plaintiff's argument misapprehends the meaning of mixed present/future statements.

A defendant may not insulate itself from liability for an affirmative statement of present fact by extrapolating future expectations.  For instance, although a statement that a company "has on hand and has access to sufficient sources of funds to meet its anticipated operating, dividend and capital expenditure needs" makes reference to anticipated future needs, it is actually a statement of present fact:  that the company *currently* has the funds on hand to meet what it *currently* anticipates it will need.  *See In re Stone & Webster, Inc. Secs. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005).  In *In re Stone & Webster*, the First Circuit went on to say "we understand the statute to intend to protect issuers . . . from liability for projections and predictions of future economic performance" - exactly the kinds of projections at issue in this case.  *Id.*

Considerations of mixed present/future statements do not take forward-looking projections outside the protection of the safe harbor merely because they also *imply* some present, unstated fact.  Indeed, some present fact "is necessarily implicit in every future prediction." *Institutional Investors Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 255-56 (3d Cir. 2009).  Plaintiff's interpretation would leave the safe harbor impotent and essentially meaningless.  If the implied present capacity that is necessarily attendant on any forward-looking statement were alone

sufficient to preclude safe harbor, no forward-looking statement could ever qualify for protection.

Of course, this does not mean that defendants are necessarily immune to liability for unfounded predictions.  As discussed above, the safe harbor specifically preserves liability for predictions made with "actual knowledge" of falsity.  *See* 15 U.S.C. 78u-5(c)(1).  Thus, a complaint may adequately allege a false statement by pleading particular facts to demonstrate that "Defendants knew the demand projections were inflated . . . , meaning they had no justification for projecting high revenue growth." *In re Smith & Wesson Hold. Corp. Secs. Litig.*, 604 F. Supp. 2d 332, 343 (D. Mass. 2009).  However, Plaintiff here pleads no such specific facts.  She recites that Metabolix had "no rational basis for their representations about reaching the Commercial Phase," (Am. Compl. ¶ 46), apparently under the mistaken belief that this catechism can carry her through a motion to dismiss.  But as discussed above, her allegations are conclusory and vague.  They fail to meet the standards that the PSLRA and Rule 9(b) require.

### 2.   Significant Demand for Mirel

Plaintiff's allegations that statements about demand for Mirel were false or misleading find no support in the factual allegations of the Complaint.

16

To be sure, Metabolix regularly stated that "[w]e continue to see significant demand for Mirel," (*e.g.*, Am. Compl. ¶¶ 48, 50), and that "we are starting to meet the pent-up demand for lots of customers that we have had in the queue for a while," (*id.* ¶ 51).  Plaintiff contends these statements were materially false or misleading because one of her confidential witnesses has stated that "there were concerns in the marketplace that Mirel was not clear or as thin as the other products available," (*id.* ¶ 42), and another stated that Telles was not "at the point where it was getting 'sustainable sales'" and "did not have a steady pipeline of return customers, nor a robust backlog of interest," (*id.* ¶ 44).  However, these anaemic accusations cannot sustain Plaintiff's claims.

As a preliminary matter, the Amended Complaint contains no specific or particular factual allegations to support the confidential witnesses statements.  They assert a lack of "sustainable sales" and an absence of a "robust backlog," but do not attempt to define or quantify either phrase.  In order to satisfy her pleading burden, Plaintiff must state with particularity how and why Metabolix's broader, more general statements were materially misleading.  *See Fitzer* v. *Sec. Dynamics Tech., Inc.*, 119 F. Supp. 2d 12, 18 (D. Mass. 2000).  It is not enough to challenge a broad statement with another broad statement.

17

Plaintiff argues that optimistic statements such as "significant interest" and "pent-up demand" can be materially misleading "while knowing [the company] was doomed - and hence that sales . . . would be doomed." *In re Allaire Corp. Secs. Litig.*, 224 F. Supp. 2d 319, 327 (D. Mass. 2002).  However, the Amended Complaint contains no factual assertions regarding Telles' sales numbers to show that it was "doomed."  In fact, the only specific numbers it alleges appear in Metabolix's own statements regarding its progress toward the First Commercial Sale and the number of customers it had - statements Metabolix offered in *support* of Telles' predicted success.  The absence of a "robust backlog of interest" is not the same as being "doomed," especially when the company was less than two years old and was still working to build its client base.  Plaintiff has not pled sufficient factual allegations to support a plausible argument that Telles was so clearly doomed that even vague positive statements must have been misleading.

Furthermore, a lack of "sustainable sales" and the existence of "significant interest" are not necessarily mutually exclusive; nor are the "lack of a steady pipeline of return customers" and a "pent-up demand for . . . customers . . . in the queue." Metabolix and the confidential witnesses might both be correct. Metabolix may have seen some significant interest in Mirel, judged from the perspective of a fledgling company, but had not

yet achieved the kind of sales to make its business sustainable without significantly more effort.  Similarly, Metabolix may have had pent-up demand "in the queue" without being able to convert them into a "steady *pipeline* of *return* customers."  Because these statements are not necessarily contradictory, Plaintiff has not alleged that Metabolix's statements were false.

Plaintiff argues that such statements may have been "so incomplete as to mislead," *Backman* v. *Polaroid*, 910 F.2d 10, 16 (1st Cir. 1990), but this misses the mark.  A defendant does not have a duty to cast the descriptions of its business in the most negative light.  Nor, as discussed above, has Plaintiff made sufficient factual allegations to support the notion that Metabolix had not, in fact, seen "significant demand" or a pent-up customer queue.  Thus, I cannot say based on the non-conclusory allegations in the Amended Complaint - even drawing all reasonable factual inferences in Plaintiff's favor - that Plaintiff has stated, with particularity, a plausible claim that Metabolix's statements were so incomplete as to mislead.  She simply has not stated, other than in conclusory contradictions, why Metabolix's statements were incomplete or misleading.

3.  Factory Delays

Plaintiff's allegation that statements attributing factory delays to third-party supply issues were false or misleading find

even less support in the factual allegations of the Amended
Complaint.

Metabolix stated on a number of occasions that Telles had
experienced delays in the Clinton, Iowa factory as a result of
its inability to get certain raw materials from third parties.
For instance, in April 2011, Metabolix stated,

> There have been two specific challenges this quarter
> that have held back some of our near term potential. .
> . . First, supply disruption of a third-party
> formulation raw material has slowed down the pace of
> commercialization . . . .  Secondly, we're working
> directly with customers to optimize the physical
> properties of our film product.

(Am. Compl. ¶ 68.)  Plaintiff alleges that this statement is
false and misleading because it "solely address[es] the supply
disruption and customer demands, yet fail[s] to disclose or
address the unresolved color, odor, and extrusion issues with the
Mirel product."  (*Id.* ¶ 69.)

There are two fundamental problems with Plaintiff's
allegation.  First, the Amended Complaint nowhere alleges that
Telles did not, in fact, experience delays as a result of
disruption in the supply of third-party raw material.  Plaintiff
apparently does not contend that this aspect of the statement was
false.  Second, Planitiff does not allege any alternative or
additional explanation for the factory delays.  Although she
implies that Metabolix should have disclosed the "unresolved
color, odor, and extrusion issues" she does not allege that the

20

quality issues were the *cause* of delays at the factory.  In fact, she alleges precisely the opposite.  She contends that Telles insisted on ramping up to production speed at the factory to the *exclusion* of addressing the color, odor, and extrusion issues. (*Id.* ¶ 40.)  She argues no differently in her opposition to Defendants' motion to dismiss.  From the allegations in the Amended Complaint to her opposition brief, she puts forward no allegation from which any fact finder could infer that statements about delays at the factory were either false or misleading.  The failure to disclose quality problems with the product presents a separate issue to which I now turn.

### 4.  Mirel Quality Issues

Plaintiff states her allegations that Metabolix misrepresented Mirel's quality issues with much more clarity and with a level of particularity sufficient to state a claim. Metabolix claimed that "based on analytical testing, the product [at the Clinton, Iowa factory] appears indistinguishable from that produced in our pilot facility."  (Am. Compl. ¶ 51.)  Yet the Amended Complaint refers to a confidential witness who specifically states that the Mirel coming out of the factory in Clinton, Iowa had significant "odor" issues as a result of the rinsing process and that the Mirel produced at the pilot factory did not have these issues.  (*Id.* ¶¶ 10, 38.)  The same confidential witness also stated that the Mirel from the Clinton

factory had "stuff in the resin" that rendered a substantial portion of the product unusable, but that the pilot program did not have the same problems. (*Id.* ¶ 39.)  The product from the Clinton factory cannot be indistinguishable from the pilot factory product and yet have contaminated resin rendering much of the product unusable and the odor issues that Plaintiff's confidential witness describes.  Even if Metabolix could draw some distinction based on the kind of "analytical testing" involved that might not detect resin contamination or odor issues, claiming that the products are indistinguishable based on the particular form of testing while obvious quality disparities remain would be "so incomplete as to mislead." *Polaroid*, 910 F.2d at 16.

After its statement that the Clinton factory Mirel was indistinguishable from the pilot factory Mirel, Metabolix had a duty to disclose any defects discovered thereafter in the Clinton factory product.  Otherwise, the prior statement would be materially misleading by omission.  Metabolix argues that Plaintiff has not adequately alleged that the color, odor, and extrusion issues were material.  However, after assurances that the two products were "indistinguishable," any indication that the Clinton factory product had noticeably inferior quality would certainly "alter[] the total mix of information" available to investors, and would therefore be material. *TSC Indus., Inc.* v.

22

*Northway, Inc.*, 426 U.S. 438, 449 (1976).  Because Telles was
using the pilot factory product to advertize and entice potential
buyers, it would have been important to investors to know that
the model product was the same as the product in mass production.
Learning of any difference would change the calculus.  The extent
of the particular significance of any differences is a question
of fact for a jury, *see In re Cabletron*, 311 F.3d 11, 34 (1st
Cir. 2002), but in light of Metabolix's assurances, an allegation
of any noticeable difference meets the basic threshold for
pleading materiality at the motion-to-dismiss stage.

Metabolix also made periodic references to "optimizing" the
physical product, but this is not enough to save its assurances
from being materially misleading.  (*See, e.g.*, Am. Compl. ¶¶ 57,
68, 74, 79.)  Even if Metabolix intended to refer to the Mirel
quality issues when it referred to optimizing the physical
product, in light of its assurances that the products were
indistinguishable, a reasonable investor could - and likely would
- interpret the term "optimizing" to imply that Metabolix was
improving the product from the standard of quality established by
the pilot plant, not that it was solving new problems in order to
achieve the pilot plant's standard of quality.  Finally, even if
disclosures regarding optimization could account for the quality
problems Plaintiff alleges, Metabolix represented that "these
specific issues are now behind us," (*id.* ¶ 57), yet Plaintiff

alleges that the quality problems persisted through ADM's termination of the joint venture.

**B.   *Scienter***

Any claim under Rule 10b-5 requires "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  "A high degree of recklessness" may also suffice.  *Aldridge* v. *A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002).  To survive a motion to dismiss, a plaintiff must plead facts with particularity that give rise to a "strong" inference of scienter.  15 U.S.C. § 78u-4(b)(2); *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 196-97 (1st Cir. 1999); *In re Boston Scientific Corp. Secs. Litig.*, 686 F.3d 21, 30 (1st Cir. 2012).  It must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  This requires more than a merely "reasonable" inference.  *See Greebel*, 194 F.3d at 196-97.  However, it need not be "of the 'smoking gun' genre, or even the 'most plausible of the competing inferences.'"  *Tellabs*, 551 U.S. at 324.

Plaintiff alleges no specific facts demonstrating consciousness of fraudulent intent.  She similarly alleges no specific facts capable of demonstrating that Defendants knew the information that she alleges contradicted their public

statements.  She pays lip service to allegations of motive and
opportunity, arguing that the Defendants had the motive to lie in
order to inflate the Metabolix stock price, but this is the
classic, hornbook example of insufficient motive pleading.  Such
a generalized motive could apply to any corporate executive at
any company anywhere in the United States.  It therefore cannot
give rise to a strong inference of scienter.  *See In re Sonus
Networks Inc. Secs. Litig.*, No. 04-cv-10294, 2006 WL 1308165, *15
(D. Mass. May 10, 2006).  Otherwise, the scienter requirement
would be meangingless because "[d]irectors and officers of all
public companies feel the same pressure to maximize the company's
value and project optimism . . . ."  *Id.*  Proper allegations of
motive and opportunity generally arise from suspicious stock
trading, but Plaintiff does not allege that Defendants sold any
stock during the class period, let alone that any trades may have
been suspicious.

Plaintiff's scienter argument relies on two basic
allegations:  (1) that Defendants must have known of the Mirel
quality issues and slackening demand by virtue of their high-
ranking positions at Metabolix, (Am. Compl. ¶ 94), and (2)
statements from a confidential witness that "there were frequent
staff meetings, at least monthly, and that Mirel sales and
customers were a constant discussion topic, as well as problems
with the Clinton Plant.  Senior management, including

25

[Defendants] Eno and Hill, routinely attended these meetings,"
(*id.* ¶ 45).  Neither is sufficient.

     As a threshold matter, these allegations, even if accepted
at face value, only impute knowledge of the underlying
discussions regarding Mirel and any quality or demand issues
associated with it.  It is not sufficient to allege that
Defendants knew of underlying facts that Plaintiff alleges are
inconsistent.  A plaintiff must allege specific facts supporting
the inference that Defendants knew that a statement was false or
misleading.  *See Greenstone* v. *Cambex Corp.*, 975 F.2d 22, 25 (1st
Cir. 1992)("[C]ourts have uniformly held inadequate a complaint's
general averment of the defendant's 'knowledge' of material
falsity, unless the complaint *also* sets forth specific facts that
make it reasonable to believe that defendant knew that a
statement was materially false or misleading." (emphasis in
original)).  At most Plaintiff's allegations support an inference
of knowledge of the true facts regarding Mirel, but they cannot
support any inference that Defendants had some consciousness that
any public statement was materially false or misleading.

     It is also well established that scienter allegations based
solely on a defendant's high-ranking position in the company are
not sufficient.  "[G]eneral inferences that the defendants, by
virtue of their position within the company, 'must have known'
about the company's problems when they undertook allegedly

26

fraudulent actions . . . 'are precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate . . . .'" *Lirette* v. *Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (quoting *Maldonado* v. *Dominguez*, 137 F.3d 1, 9-10 (1st Cir. 1998)); *see also Urman* v. *Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 283 (D. Mass. 2011).

Plaintiff's reliance on *Crowell* v. *Ionics* and *In re Allaire* for the proposition that she can rely on Defendants' positions at Metabolix to plead scienter is misplaced.  In both *Crowell* and *In re Allaire*, the plaintiffs set out specific factual allegations demonstrating understanding and intent to commit fraudulent activity.  For instance, in *Crowell*, the plaintiffs alleged that one of the defendants, Daniel Kuzmak "ordered contract cost estimates falsified," stating at one particular meeting "I want to go on the record stating it's not proper accounting - but it's nice to make money." *Crowell* v. *Ionics, Inc.*, 343 F. Supp. 2d 1, 5-6 (D. Mass. 2004).  Similarly, in *In re Allaire*, the plaintiffs alleged that the defendants sold nearly $53 million in stock - for some, nearly 40% of their entire holdings - after making the false statements despite the fact that none had ever sold stock on the open market before.  *See In re Allaire*, 224 F. Supp. 2d 319, 331 (D. Mass. 2002). These kinds of suspicious stock trades are precisely the kind of motive and opportunity that can give rise to a strong inference of scienter.  By contrast, the

allegations in the Amended Complaint in this case fall well below this level of specificity, stating only that the Defendants were high-ranking executives and attended unspecified meetings where they discussed unspecified topics.

The allegations that the defendants attended unspecified meetings where Mirel was "discussed constantly" also falls well below the threshold for adequately pleading scienter. While attendance at such meetings might be capable of raising a reasonable inference of knowledge, it does not raise the required *strong* inference. Rather, a plaintiff "must allege details of defendants' alleged fraudulent involvement, including specifics as to what defendants had knowledge of and when." *In re Boston Tech. Secs. Litig.*, 8 F. Supp. 2d 43, 57 (D. Mass. 1998); *see also Urman*, 796 F. Supp. 2d at 283. Plaintiff in this case makes no allegations regarding any particular meeting that Defendants attended or any specific discussions that occurred at any meeting. There is no way, from the allegations in the operative complaint, to infer what defendants knew or when. I must therefore dismiss Plaintiff's complaint for failure to plead scienter adequately.

## C.   *Loss Causation*

Plaintiff has also failed to plead loss causation sufficiently. She alleges and acknowledges that Metabolix stock dropped following ADM's termination of the joint venture, but she

alleges no facts connecting the termination to any false or
misleading statement by the Defendants.  It is not enough to
allege that Defendants made false statements on the one hand and
that some announcement caused a stock drop on the other.  The
announcement must have been a "corrective disclosure," meaning
that the announcement must *connect* the current, present, negative
information to the earlier false or misleading statement.  15
U.S.C. § 78u-(b)(4); *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336,
347 (2005).  If Plaintiff's loss resulted from the disclosure of
negative information other than a prior false or misleading
statement by the Defendants, then she cannot show that
Defendants' conduct caused her injury and she has not pled an
adequate claim for securities fraud.

### 1.  Pleading Standard

The Circuits are split regarding the applicable pleading
standard for loss causation.

The Fourth Circuit has held that Rule 9(b) applies because
loss causation is "among the circumstances constituting fraud."
*Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 n.5 (4th
Cir. 2011).

The Fifth Circuit has held that Rule 8(a) applies because
the Supreme Court's decision in *Twombly* construed *Dura* in coming
to the plausibility standard governing Rule 8.  *See Lormand* v.
*U.S. Unwired, Inc.*, 565 F.3d 228, 256-58 (5th Cir. 2009).

29

The First, Ninth, and Second Circuits have all specifically declined to decide the issue. *Massachusetts Ret. Sys.* v. *CVS Caremark Corp.*, 716 F.3d 229, 239 n.6 (1st Cir. 2013)("It is unclear whether a plaintiff may plead loss causation with 'a short and plain statement of the claim showing that the pleader is entitled to relief,' or if there is a heightened standard akin to the rule that 'a party must state with particularity the circumstances constituting fraud.' . . . Here, the Retirement Systems' allegations are specific enough that the outcome would be the same under either standard."); *Action AG* v. *China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012)("[L]ike the Ninth Circuit, [we] find it unnecessary to resolve this issue at this time."); *WPP Lux. Gamma Three Sarl* v. *Spot Runner, Inc.*, 655 F.3d 1039, 1053-54 (9th Cir. 2011)("However, it is unnecessary to decide [the pleading standard for loss causation] issue, because the amended complaint offers sufficient detail to give defendants ample notice of the loss causation theory, and gives some assurance that the theory has a basis in fact" (internal alterations and quotation marks omitted).).

Recognizing that my colleague Judge Gorton applied the plausibility standard of Rule 8, *See Urman* v. *Novelos Therapeutics, Inc.*, 867 F. Supp. 2d 190, 198 (D. Mass. 2012) (Gorton, J.) ("Post-*Twombly*, a plaintiff's loss causation theory must be plausible."), I would nevertheless join the Fourth Circuit in applying the heightened pleading standard of Rule 9(b)

to allegations of loss causation.  Rule 9(b) states that a party must plead "with particularity the circumstances constituting fraud."  Fraud is a term of art with a particular defined meaning.  In the securities context, fraud requires six elements: (1) material misstatement, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura*, 544 U.S. at 341-42.  Fraud is more than merely a material misstatement and scienter.  It would not plead "the *circumstances* constituting fraud" merely to allege these two of the six elements.  Indeed, the absence of any of these six factors takes the action out of the realm of fraud. Thus, in order to plead fraud with particularity - according to the meaning of fraud as a term of art - a party must plead each element defining fraud with the level of particularity that Rule 9(b) requires.  *See Katyle*, 637 F.3d at 471 n.5.  The PSLRA set out specific pleading standards governing material misrepresentation and scienter superceding Rule 9(b) in the securities context, *see* 15 U.S.C. § 78u-4(b)(1)-(2), but it did not change the standards of pleading for the other elements of fraud, thereby leaving Rule 9(b) intact.

In reducing the pleading standard for loss causation, the Fifth Circuit relied on the Supreme Court's decisions in *Dura* and *Twombly*, which applied Rule 8.  *See Lormand*, 565 F.3d at 256-58. However, the Supreme Court in *Dura* merely "assume[d], at least for argument sake that neither the Rules nor the [PSLRA] impose

any special further requirement [other than Rule 8] in respect to the pleading of proximate causation or economic loss." *Dura*, 544 U.S. at 346.  It specifically did not decide the issue.  *Id.* *Dura* applied Rule 8 on an assumption; it did not hold that Rule 8 applies to loss causation.  Thus, the Supreme Court's subsequent reliance on the *Dura* decision - as in *Twombly* - logically cannot lend any more support to the Fifth Circuit's position than *Dura* itself.

Although I find that Rule 9(b) governs loss causation pleading, it is ultimately not material because I find the allegations here do not reach even the Rule 8 plausibility level.

### 2.  Relevant Statements

Plaintiff bases her claim on allegedly false statements regarding Mirel quality and demand.  Yet the stock price did not fall in response to any public disclosure of quality problems or lack of demand for the product, but as a result of ADM's termination of the joint venture, (*see* Am. Compl. ¶ 102), a risk Metabolix repeatedly and regularly disclosed in its statements, press releases, and filings.  Plaintiff might be able to support her claim if ADM's decision to terminate the joint venture had been the direct result of learning of the quality issues and lack of demand for Mirel, but she alleges no facts support that inference.

When Metabolix explained the reasons for ADM's decision, it stated that "ADM indicated that the projected financial returns

from the alliance were too uncertain."  (Am. Compl. ¶ 81.)  It
did not mention any issues with Mirel quality or any deficiency
in demand for the product.  ADM echoed the same sentiments in its
own press release regarding the termination.  It stated that it
"analyzed [its] business portfolio, identifying areas that are
not delivering sufficient results . . . [and] uncertainty around
projected capital and production costs, combined with the rate of
market adoption led to projected financial returns for ADM that
are too uncertain."  (*Id.* ¶ 85.)

There are potentially an infinite number of reasons why a
company's financial returns might be "uncertain" and an equally
infinite variety of reasons why ADM might have determined the
level of uncertainty to be too great to continue to bear.  This
does not suggest that ADM was aware of the kind of quality issues
or lack of demand that Plaintiff alleges.  It merely suggests
that ADM sought investments with surer returns.  It did not state
that the market was not adopting the product, but merely that the
"rate of market adoption" was too uncertain for ADM to continue.
(*Id.*)  Plaintiff alleges no more than her own *ipse dixit* to
suggest that ADM considered the financial returns too uncertain
because of any failure to reach the Commercial Phase.

Furthermore, ADM explained in another press release,
attached to the same 8-K announcing the termination of the Telles
venture, that it was "streamlin[ing] its organization structure",
eliminating about 1,000 positions, and attempting to reduce its

annual pre-tax expenses by more than $100 million. (Birnbach
Decl., Ex. 29, Ex. 99.1.)  In light of these statements, the
overwhelmingly more plausible inference is that ADM terminated
the joint venture for precisely the reason it stated:  that
projected financial returns were too uncertain for a business
attempting to cut back its annual pre-tax expenses.  Plaintiffs
proposed inference - that uncertain projected financial returns
was a euphemism for the kind of product failure Plaintiff alleges
- is not plausible in light of the allegations of the Amended
Complaint and statements in the operative documents it cites.

Because Plaintiff fails to plead a plausible connection
between the event causing her loss and the statements she alleges
were false or misleading, I must dismiss her Amended Complaint
for failure to plead loss causation.

## IV.   CONCLUSION

For the foregoing reasons, I GRANT Defendant's Motion to Dismiss
the Amended Complaint (Dkt. 26).


                              */s/ Douglas P. Woodlock*
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE